IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs November 19, 2024

## STATE OF TENNESSEE v. SERGIO RANGEL

**Appeal from the Criminal Court for Knox County**
**No. 122689   G. Scott Green, Judge**

_____

**No. E2024-00483-CCA-R3-CD**

_____

The Defendant, Sergio Rangel, was convicted by a Knox County Criminal Court jury of facilitation of aggravated burglary, a Class D felony, and sentenced by the trial court as a Range I, standard offender to four years, suspended to three years of supervised probation following twelve months of confinement. The sole issue the Defendant raises on appeal is whether the evidence is sufficient to sustain his conviction. Based on our review, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the correct conviction offense.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TOM GREENHOLTZ, J., joined.

J. Liddell Kirk, Madisonville, Tennessee (on appeal); and Michael Graves, Knoxville, Tennessee (at trial), for the appellant, Sergio Rangel.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald and Molly Martin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the Defendant's participation with two codefendants, Serena Hammond and Shamar Rowe, in events that transpired on the evening of June 11, 2022, at the Knoxville home of Elizabeth Ann Allen, the victim. The Defendant was Codefendant Hammond's boyfriend at the time, and the victim's granddaughter, Hannah Blair, was the girlfriend of Codefendant Hammond's brother, Dontae Hammond. According to the State's proof at trial, the events that evening were instigated at the direction of Mr. Hammond from the jail due to Mr. Hammond's unhappiness with Ms. Hannah Blair's failure to return his telephone calls. Codefendant Hammond, accompanied by Codefendant Rowe, the Defendant, and other individuals who arrived in multiple vehicles, came to the victim's home at 9:14 p.m. on June 11, 2022, where Codefendant Hammond angrily demanded that the victim send out Ms. Hannah Blair and the boyfriend of the victim's other granddaughter. When the victim refused, Codefendant Hammond forced her way inside the home and began beating the victim with her fists and with the victim's baseball bat. The Defendant threatened to hit the victim before Codefendant Hammond entered the home, and both the Defendant and Codefendant Rowe entered the home after Codefendant Hammond's entry to assist her by restraining the victim's pit bull. The Knox County Grand Jury returned a three-count indictment that charged Codefendant Hammond in counts one and three with aggravated assault and attempted second degree murder, and all three codefendants in count two with aggravated burglary by entering a habitation and committing or attempting to commit an assault while acting in concert with two or more other persons. The three codefendants were jointly tried on those charges before a Knox County Criminal Court jury from September 18-21, 2023.

The victim testified at trial as follows. In June of 2022, she was living in a home on Edgewood Avenue in Knoxville with her granddaughter, Taylor Blair, and Taylor Blair's boyfriend, Bryce.[1] Hannah Blair, Taylor's[2] sister, had lived with the victim prior to June 2022 and currently lived with her, but the victim and Hannah had experienced some conflict, and on June 11, 2022, Hannah was living with her "papaw." Hannah's boyfriend at that time was Dontae Hammond, who was the brother of Codefendant Hammond. The victim was familiar with Dontae Hammond and Codefendant Hammond and had also met "[q]uite a few" of Mr. Hammond's friends, including the Defendant and Codefendant Rowe.

On June 11, 2022, the victim was at home with Taylor, Bryce, and her pit bull, "Koda," an inside pet. She had worked the third shift and was still in bed when she was awakened by a text message from Taylor. In response, she got up and went to the living room, where someone was "beating on the door." She opened the wooden door and saw

_____

[1] This individual's last name was never identified at trial.

[2] Because these individuals share the same last name, we will refer to them at times by their first names only. We intend no disrespect.

- 2 -

Codefendant Hammond walking away from the porch toward a vehicle in which the Defendant was sitting. Codefendant Hammond was talking, but the victim could not hear because Koda was barking so loudly. The victim gestured toward her ear to indicate she could not hear, and Codefendant Hammond returned to the victim's porch and demanded that the victim send Hannah and Bryce outside. When she refused, Codefendant Hammond retrieved a black handgun with an extended clip from the vehicle in which the Defendant was sitting, which was one of five vehicles pulled up on the street outside the victim's home. Codefendant Hammond then returned to the victim's front door with the gun and threatened to shoot the victim.

The victim and Codefendant Hammond "exchanged words." Codefendant Hammond took the gun back to the vehicle, returned to the victim's front porch, and "exchanged some more words" with the victim. During that time, the victim was holding Koda by his collar with her left hand and the storm door partially open with her right hand. Codefendant Hammond punched her in the nose through the partially open storm door, forced the door out of her hand, and entered her home. Once inside, Codefendant Hammond was "steadily punching" the victim with her fists as the two continued "exchanging words."

The victim knew that the Defendant and Codefendant Rowe came in during that time because she could hear them saying, "Get the dog. Get the dog." Koda was barking, and the Defendant and Codefendant Rowe shut him in the corner bedroom. Other men that the victim did not recognize came in her home as well, for a total of thirteen intruders - - Codefendant Hammond and twelve men. In the meantime, the victim and Codefendant Hammond were fighting in the corner where the victim kept a metal baseball bat, with Codefendant Hammond "steadily beating [the victim] with her fists in the head and face." The victim grabbed her baseball bat, but Codefendant Hammond took it from her and began using it to beat her in the head. The victim recalled seeing the light from a cell phone and speculated that one of the men might have recorded the beating.

In addition to beating her in the head with the bat, Codefendant Hammond bit the victim on the cheek. The next thing the victim knew, Codefendant Hammond said, "Somebody get this b**** off me, she's bleeding all over me." The bat was thrown on the floor, "[a]nd they all le[ft] as quick as they got there." After her granddaughter returned her eyeglasses that Codefendant Hammond had knocked off her face, the victim called 9-1-1 to report that she had been assaulted.

The victim never gave the codefendants or anyone with them permission to enter her home that night; to the contrary, she told them that they were trespassing and to get off her property. She talked to the police before being transported by ambulance to the hospital, where she had x-rays and a CT of her head. She had a fractured nose, two large

gashes on the side of her head, and aches over her entire body. In addition, the bite wound on her cheek became infected. She did not think she lost consciousness during the beating, but she was in a dazed state, with her head "really hurting," as she related what happened to the responding police officers before she was transported to the hospital.

The victim's 9-1-1 call, a police officer's body camera footage, photographs of the victim's injuries and home, and four surveillance videos from a neighbor's security camera were admitted as exhibits and published to the jury. As the surveillance videos were played, the victim narrated what was happening. According to the victim, the Defendant came onto her porch with Codefendant Hammond at one point and told her that if she touched Codefendant Hammond, he would "hit [the victim] as well."

The victim testified as follows on cross-examination. She had met Codefendant Hammond "only . . . a few times" before June 11, 2022, "when [Mr. Dontae Hammond] would get in a twist and call his sister to come smack whoever around because he wouldn't do it." Prior to June 11, Mr. Hammond had stayed with the victim's granddaughter, Hannah, at the victim's home, and on June 11 he still had some possessions in her home. She and Mr. Hammond had a conflict because she did not like how he talked to her or the way he treated Hannah. Mr. Hammond had to leave her home due to their conflict, and when he left, Hannah left with him. Koda was Hannah's dog, although the victim had papers to show that he was "in [the victim's] name." When Hannah and Mr. Hammond left the victim's home, Koda remained behind with the victim but spent some time visiting with Hannah and Mr. Hammond at their home. Koda, therefore, was familiar with the Defendant and his codefendants.

Codefendant Hammond did not say why she wanted the victim to send Hannah and Bryce out. The victim inferred, however, that her intent was not to talk to them: "When you have five cars pull up with roughly 12 guys coming out of cars and [Codefendant Hammond] on my porch not in a very good mood telling me to send these people out, my own granddaughter, and then my other granddaughter's boyfriend . . . So I'm not sending people out." She told Codefendant Hammond that Hannah was not there, and it was at that point that Codefendant Hammond retrieved the gun from the vehicle and returned to threaten her with it.

The victim further testified on cross-examination as follows. She was focused on Codefendant Hammond and the gun and did not see Codefendant Hammond hand the gun to anyone in the vehicle. She probably testified at the preliminary hearing that she saw Codefendant Hammond hand the gun to the Defendant because Codefendant Hammond and the Defendant were always together, and she assumed that they had arrived at her home in the same vehicle. When asked if she told detectives during an interview on June 13 that she could not definitely say that the Defendant entered her home, she responded that the

- 4 -

Defendant came to the porch and told her that he would hit her if she hit or touched Codefendant Hammond. She then testified that the Defendant "was in the house. They came in with her." Although her eyeglasses were knocked off during the altercation, she was still able to see because she used her eyeglasses for reading, not distance.

The victim acknowledged that the surveillance videos showed that the entire episode lasted only five minutes. She conceded that she told a police officer on June 14 that her information about the individuals who entered the home with Codefendant Hammond came from Taylor, who relayed the same information to the police but did not want to otherwise have any involvement in the case.

On redirect examination, the victim expressed her certainty that the Defendant and Codefendant Rowe entered her home and restrained her dog, testifying that she saw them inside and that she was testifying truthfully.

Captain Emily Ayers of the Knox County Sheriff's Office, the Director of the Intake Release Center and the keeper of the records for jail phone calls, identified several video phone calls made by Dontae Hammond from the jail on July 11, 2022: a call to Hannah Blair at 8:21 a.m.; calls to Codefendant Hammond at 6:08 p.m., 6:15 p.m., and 6:24 p.m.; and a video call to a number of individuals in a vehicle at 8:27 p.m., which showed that the Defendant was in the vehicle.

Lieutenant Joshua Shaffer of the Knoxville Police Department testified as follows. He supervised the Organized Crime Unit "that investigates organized crime, whether it be drug, gang, gun related[,]" and was assigned to investigate the victim's case. On June 13, 2022, he spoke briefly with the victim, canvassed the neighborhood, and located the previously admitted surveillance videos, which came from a home across the street from the victim's home. He was familiar with three of the vehicles that appeared in those videos: a yellow Chevrolet Cobalt used by Codefendant Hammond, the Defendant, and an individual named Brandon Woods; a small white car that he had seen in a Facebook post "with other members of this group"; and a large white sedan that looked similar to a Crown Victoria or a Mercury Grand Marquis that an individual named Dakota Hill and others had been using. He was also familiar with the three codefendants and made positive courtroom identifications of them before identifying them from still shots from the surveillance videos. He believed that the park visible in Mr. Hammond's video call to the individuals in a vehicle was located behind a church and explained its proximity to the victim's home.

Lieutenant Shaffer testified on cross-examination as follows. He believed that they had located the gun involved in the incident. He did not mention anything about a gun in the case notes he made following his June 13 interview with the victim, but he had already reviewed the report that mentioned the gun. The victim told him during their brief June 13

interview that she could not definitely say that the Defendant entered her home. However, the victim had been awake for several days at that point and "was still confused about a lot of events." From the brief synopsis he made of his conversation with the victim, the victim mentioned having recognized Dakota Hill and Codefendant Rowe, whom she described as an individual with "long braids." The victim told him that she only saw them outside, or "something to that extent." The victim then referred to her granddaughter Taylor. He tried to get Taylor to give a statement, but Taylor "apparently was too afraid."

Twenty-one-year-old Codefendant Hammond testified in her own defense as follows. Mr. Hammond had been unable to reach Hannah and instructed Codefendant Hammond to retrieve his belongings from the victim's home. She went to the victim's home accompanied by others to help her move the belongings. The victim appeared intoxicated when she answered the door, spat in her face, and released her pit bull with the command to bite her. When the pit bull did not bite, the victim took the dog and put him in a bedroom. The victim returned to the front door, told her to wait, and said she would be back in a moment. The victim left the room, and Codefendant Hammond stepped inside the home. The victim then came out of her bedroom with a baseball bat and hit her with it two or three times. She took the bat from the victim, the victim jumped on her back, and she hit the victim with the bat approximately three times. She finally managed to get the victim off her and immediately left the home. No one came in the home with her. She never had a gun, and her intention in going to the victim's home was not to fight, but to retrieve her brother's belongings.

On cross-examination, Codefendant Hammond testified as follows. Mr. Hammond had been arrested after he and Hannah moved out of the victim's home, and he was in jail on June 11. On a previous occasion, Mr. Hammond had asked her to track Hannah down when he was unable to get in touch with her. On June 10, Mr. Hammond called her again because he had been unable to reach Hannah. She searched for Hannah at Hannah's grandfather's home and at the victim's home but could not find her. She told Mr. Hammond that she could not find Hannah and mentioned on one of the video calls that she would tell "the boys." Mr. Hammond indicated that he was through with Hannah and wanted Codefendant Hammond to retrieve his belongings. She was at the park at that time with the Defendant, Codefendant Rowe, Dakota Hill, and a few other men. She texted Taylor to let her know that she was coming and to ask where Hannah was, and "the boys" accompanied her to the victim's home to help move the belongings. The victim never invited her into her home, but she believed that the victim had stepped away to retrieve Mr. Hammond's belongings, so she stepped over the threshold to be ready to receive them.

During the altercation, the men who had accompanied her to the victim's home remained standing at the vehicles. No one came onto the porch with her, and no one other than her entered the home. To her knowledge, no one filmed the incident. She was arrested

- 6 -

on June 12 and taken to jail, but she did not recall having made any jail phone calls. After listening to a recorded phone call, she identified her voice, her mother's voice, and the Defendant's voice but denied that she knew anything about the video that her mother talked about during the call. She also identified her voice, Mr. Hammond's voice, and the Defendant's voice on a June 16 phone call that Mr. Hammond made to her from the jail after she had been released on bond, during which Mr. Hammond talked to her and the Defendant about the June 11 incident. On June 26, 2022, she, Brandon Woods, and possibly the Defendant were together in Mr. Woods's yellow car when the police seized a gun with an extended clip from the vehicle.

The Defendant and Codefendant Rowe each elected not to testify, and neither presented any witnesses.

After deliberating, the jury convicted Codefendant Hammond of the indicted offenses in counts one and two and of the lesser-included offense of attempted voluntary manslaughter in count three, Codefendant Rowe of the lesser-included offense of aggravated criminal trespass, and the Defendant of the lesser-included offense of facilitation of aggravated burglary. The trial court subsequently sentenced the Defendant as a Range I, standard offender to four years in the Tennessee Department of Correction, suspended to supervised probation after service of twelve months. Following the denial of his motion for a new trial, the Defendant filed a timely notice of appeal to this court in which he challenges the sufficiency of the convicting evidence.

## ANALYSIS

The Defendant contends that the evidence is insufficient to sustain his conviction for facilitation of aggravated burglary, arguing that the victim's testimony was clear that he did not enter the home until after Codefendant Hammond had already entered, and that there was no proof that he took any action to assist Codefendant Hammond's entry into the home. He asserts that it was not clear which individual moved the dog into a bedroom, but even if the dog's movement could be attributed to him, "[m]oving the dog did not furnish any assistance to [Codefendant] Hammond's entry into the victim's home." The State argues that there was overwhelming evidence in support of the Defendant's conviction for facilitation of aggravated burglary. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of

- 7 -

fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).\

As charged in this case, to sustain the Defendant's conviction for facilitation of aggravated burglary, the State had to prove that the Defendant, knowing that Codefendant Hammond intended to enter the victim's home and commit an assault, furnished substantial assistance to Codefendant Hammond in the commission of that felony. Tenn. Code Ann. §§ 39-11-403(a); 39-13-1002(a)(3); 39-13-1003(a).

Viewed in the light most favorable to the State, the proof established that the Defendant accompanied Codefendant Hammond, Codefendant Rowe and others to the victim's home as Codefendant Hammond attempted to track down her brother's girlfriend, Hannah Blair. When the victim told Codefendant Hammond that Hannah was not there and refused to send anyone out of the home, Codefendant Hammond retrieved a gun from a vehicle and threatened to shoot the victim. As she and the victim argued, the Defendant came onto the victim's porch and threatened physical violence against the victim if the victim touched Codefendant Hammond. Codefendant Hammond then punched the victim, forced her way into the home, and began assaulting the victim with her fists and with a baseball bat. During this time, the Defendant and Codefendant Rowe entered the home and assisted by confining the victim's pit bull in a bedroom. This was more than sufficient evidence for a rational jury to find the Defendant guilty of the facilitation of aggravated burglary beyond a reasonable doubt.

We agree with the State that the Defendant's reliance on the fact that Codefendant Hammond had already entered the home and begun fighting with the victim before the Defendant entered the home is to no avail. First, the Defendant need not have ever entered the home for a rational jury to reasonably find that he furnished substantial assistance in the aggravated burglary of the home, as the evidence established that he threatened the victim as he was standing with Codefendant Hammond before Codefendant Hammond forced her way into the home. *See*, *e.g.*, *State v. Williams*, No. E2018-00086-CCA-R3-CD, 2019 WL 913167, at *5 (Tenn. Crim. App. Feb. 22, 2019), *no perm. app. filed* (affirming defendant's conviction for facilitation of aggravated burglary when there was evidence that defendant acted as a lookout while others entered a home to commit a theft); *State v. Johnson*, No. W2012-01467-CCA-R3-CD, 2013 WL 5522220, at *5 (Tenn. Crim. App. Oct. 3, 2013), *perm. app. denied* (Tenn. Feb. 12, 2014) (affirming defendant's conviction for facilitation of aggravated burglary when evidence established that he relayed information about the number of victims in the home and provided a gun to the individual who entered the home to rob the victims). Second, as the State points out, Codefendant Hammond was still assaulting the victim when the Defendant entered the home and restrained the victim's pit bull, thus furnishing substantial assistance to Codefendant Hammond in the completion of the aggravated burglary. We, therefore, affirm the Defendant's conviction for facilitation of aggravated burglary. However, because the judgment erroneously lists the conviction as aggravated burglary rather than facilitation of aggravated burglary, we remand to the trial court for entry of an amended judgment to reflect the correct conviction offense.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court but remand for entry of a corrected judgment.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE